**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DELAWARE COUNTY CHAMBER OF** | : | |
| **COMMERCE, ET AL.,** | : | **CIVIL ACTION** |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **No. 12-2280** |
| | : | |
| **USI INSURANCE SERVICES, LLC, et al.,** | : | |
| **Defendants.** | : | |

**Goldberg, J.**                                                          **December 30, 2013**


<u>**Memorandum Opinion**</u>

Resolution of this lawsuit centers around the alleged misuse of a business membership list and interpretation of a "Royalty Agreement" entered into by the respective parties.

Plaintiffs are the Delaware County Chamber of Commerce and its subsidiary Delco Chamber Member Services, Inc., (collectively "Delco" or the "Delco Chamber"), a membership organization that provides businesses with certain programs and benefits. Delco hired Defendants, USI Insurance Services, LLC, USI Holdings Company, Dexter-Bertholon-Rowland, Inc. and Bertholon-Rowland, Inc. (collectively "USI"), an insurance broker, to provide health insurance services to members of the Delco Chamber. Delco alleges that USI misappropriated its membership list after its contract with USI terminated.  Specifically, Delco asserts that USI improperly used the list to automatically enroll Delco Chamber members in a competing organization, the Pennsylvania League of Independent Businesses (PLIB).  Delco alleges that USI did this in order to continue to be able to provide special health insurance rates applicable to members of such associations, and thereby keep those businesses as USI's clients.  According to

1

Delco, USI's conduct caused many members to leave the Delco Chamber or not enroll with Delco's new insurance administrator, resulting in a loss of revenue.

Delco has brought claims for breach of contract, unjust enrichment, conversion and intentional interference with contractual relations against USI and PLIB. USI has moved for summary judgment, arguing that Delco has insufficient evidence to support its claims that USI breached any provision of the agreement, or misappropriated Delco Chamber's membership list.[1] For the reasons that follow, we agree with USI and will grant the motion.[2]

## I.      Factual and Procedural History

The Delco Chamber is a membership organization made up of local businesses. The Chamber provides certain programs and benefits to its members in exchange for membership dues and program fees. Among those benefits is access to health insurance programs and related services that members may use to provide insurance to their employees. During the times relevant to this case, "association" coverage through the Delco Chamber could provide significant benefits to small employers, especially sole proprietors, who could secure group rates otherwise unavailable to them. Another benefit, which was more broadly shared among Delco members, was billing administration provided through an insurance broker, rather than directly by the insurance carrier. (Tyer Dep., at 57-58.)

---

[1] PLIB is listed on the docket as a defendant, but it does not appear that the PLIB was ever served. Paul Tyer, USI Affinity's President, testified that he believes PLIB no longer existed as an entity at the time of his deposition. (Tyer Dep., at 64.) In any event, to the extent Delco makes claims against PLIB, they cannot survive independently of the claims against USI.

[2] In light of our conclusion that summary judgment is appropriate, Plaintiffs' Motion to Exclude the Testimony of Ricardo Zayas (Doc. No. 34) and Defendants' Motion to Exclude the Testimony of Edward Wilusz (Doc. No. 35) will be denied as moot.

2

A.      The Royalty Agreement

In February 1998, Delco selected USI as the exclusive insurance broker for its members, and the parties entered into a "Royalty Agreement."[3]  (Resp., Ex. A.)  As part of the Royalty Agreement, and in order to facilitate USI's solicitation and servicing of the Delco Chamber members, Delco agreed to provide USI with its Membership List, subject to certain limitations:

> DELCO agrees to provide CIS with a complete list of its members ("Membership List") including each member's name, address, and telephone number, as required by CIS to solicit and place insurance coverage. The Membership List shall remain at all times the property of DELCO. DELCO will not provide the Membership List to any entity other than CIS for the purpose of selling or servicing insurance products to DELCO members. . . . All copies of the DELCO membership lists shall be returned to DELCO, and deleted from CIS's computer system upon the termination of this Agreement.

(Royalty Agreement, ¶ 6.) The Royalty Agreement also imposed certain requirements on USI during the term of the agreement. Specifically, it required USI to promote membership in the Delco Chamber to non-members "where appropriate," and to "maintain the confidentiality of all information supplied by the [Delco Chamber] including, but not limited to, the Membership List."  (Royalty Agreement, ¶¶ 7(f), 10.)

The Royalty Agreement also contained a provision which provided that USI would maintain ownership of its "Insurance Records":

> It is specifically understood and agreed that all insurance records regarding DELCO Members acquired or developed during the Initial Term of this Agreement, or any Renewal Term, are and shall be the sole and exclusive property of CIS, and DELCO shall not directly or indirectly do anything or take any action which will

---

[3] The Royalty Agreement refers to "Colburn Insurance Services," or "CIS," USI's trade name at the time of the agreement.  Thus, for clarity purposes, "CIS" is the same entity as Defendant USI.

in any way or manner dilute the exclusivity and proprietary nature
of such insurance records.

(Royalty Agreement, ¶ 9.) In return for its status as exclusive broker for Delco's insurance

program, USI paid Delco a monthly royalty fee. (Royalty Agreement ¶ 8.)

### B. Performance Under the Royalty Agreement

Following execution of the Royalty Agreement, Delco provided USI with a Membership

List, in the form of a Microsoft Excel spreadsheet containing the names of all members, their

addresses, and telephone numbers. (Vermeulen Dep., at 32.) Delco also provided USI with a

number of copies of its "Membership Directory" in paper form, for use by USI's sales staff.

(Vermeulen Dep., at 154-55.) This same Membership Directory was distributed in paper form to

all members of the Delco Chamber, of which USI was one.[4] (Vermeulen Dep., at 155.) The

Directory contained nearly identical information to the Membership List provided under the

Royalty Agreement, although the contact information in the Directory was not as expansive.

(Vermeulen Dep., at 148-49.) Information about the Delco Chamber's members was also

available online, but could not be viewed as a single list containing all members.

---

[4] Jeffrey Vermeulen, President of the Delco Chamber from 2007 to 2009, acknowledged in his
deposition that USI was not required to return its own copy of the Membership Directory:

> Q: My question was: Why did you expect USI to return
> membership directories that were in its possession because it was a
> member of Delco?
>
> A: Good question. You know what? I can't answer that. I can't.
>
> Q: Okay. But you are saying that you expected that to happen?
>
> A: In hindsight, I think I very well might have, but now that we're
> looking at it, you know, four years after the fact, . . . as a member
> in good standing they were entitled to have the directory, the book.

(Vermeulen Dep., at 155.)

4

USI operated as the Delco Chamber's exclusive insurance broker under the Royalty Agreement through 2007. As part of its operations, USI used two different systems to manage its marketing and insurance services. For sales and marketing purposes, USI used a software program called Sales Logix, where it stored information about prospective clients in a database. (Mullin Dep., at 11.)  When USI received the Membership List from the Delco Chamber, it input the membership information into its Sales Logix system. (Tyer Dep., at 30.)   Sales representatives also used physical copies of the membership directories for marketing purposes. (Tyer Dep., at 30.) USI used a separate database it called "CIA" to maintain its insurance records and serve existing clients.  (Tyer Dep., at 98.) The information in the CIA database was obtained from the insurance applications of USI's clients and included the client's contact information, and details about the insurance policy provided through USI. (Tyer Dep., at 11.)  Each client in the CIA database was also assigned an "Association Code," a numerical code signifying that the client was part of an association. (Tyer Dep., at 12-14.) USI used these association codes to identify which clients were members of a particular organization, and entitled to any services or pricing unique to that organization. The codes were also important to USI's billing process, wherein clients were organized by the association to which they belonged.  (Tyer Dep., at 16.)

### C.     The USI Termination

Sometime during 2007, Delco began to consider terminating the Royalty Agreement with USI in hopes of producing more revenue for itself by conducting insurance services through a for-profit subsidiary licensed to sell insurance. (Vermeulen Dep., at 205.) In preparation for that switch, Delco took bids from brokers, including USI. (Tyer Dep., at 91.) The broker Delco eventually chose, Brown & Brown, suggested that it could help produce more than $2.1 million per year in extra revenue for the Delco Chamber compared to the revenue Delco received from

the USI contract. (Vermeulen Dep., at 210-11.) In the process of presenting its bid, Brown &

Brown represented to Delco that in order to retain its Delco-member clients, USI would have to

get each client to sign a broker of record letter or other additional document that "would have

allowed for direct billing from" the insurance company (rather than billing through USI).

(Vermeulen Dep., at 203.) Brown & Brown anticipated that it would also have to get each

potential Delco-member client to sign a "broker of record" letter in order to switch from USI to

Brown & Brown. (Vermeulen Dep., at 202.) In Delco's view, USI and Brown & Brown would

compete for USI's Delco-member clients on an "equal playing field," because each client would

have to take some affirmative step in choosing between USI and Brown & Brown. (Vermeulen

Dep., at 166.)

  Brown & Brown's strategy turned out to be wrong. After Delco notified USI that it was

electing to terminate the Royalty Agreement effective January 1, 2008, USI contacted the

Pennsylvania League of Independent Businesses ("PLIB"), a competitor of the Delco Chamber,

as part of an effort to retain clients that were members of the Delco Chamber. USI then made

arrangements to automatically enroll its Delco Chamber clients in the PLIB. (Sekkes Dep., at 35-

45.) The President of USI's benefits division, Paul Tyer, contacted the PLIB board of directors

and the PLIB agreed to automatically enroll any USI clients that were also members of the Delco

Chamber. (Tyer Dep., at 66-68.) Because PLIB, like Delco, was an association approved by Blue

Cross, Blue Shield, USI was able to offer its members continued brokerage services without the

need to sign an additional document or take any additional steps. (Tyer Dep., at 68; Sekkes Dep.,

at 43-44.) Indeed, PLIB did not even charge the Delco members dues.  The fact that USI's clients

did not have to act to remain USI clients, and were automatically enrolled in a competing

business association, free of charge, presumably gave USI a large competitive advantage in its fight with Brown & Brown over its Delco clients.

### D.  USI's Post-Termination Conduct

On January 1, 2008, the Royalty Agreement between USI and the Delco Chamber terminated. Tyer testified that leading up to the Agreement's termination, USI took steps concerning the Delco Chamber's proprietary Membership List. USI deleted all records associated with Delco Chamber members from its Sales Logix system, and never contacted any non-client members of the Delco Chamber after termination of the Royalty Agreement. (Tyer Dep., at 36-42.)[5] Additionally, USI returned several hard copies of the Membership List. (Tyer Dep., at 28; Vermeulen Dep., at 153 ("I do believe we actually did receive a directory or . . . more returned to the office.").) Having taken these steps, USI put into motion its plan to retain its Delco-member clients.

On January 2, 2008, the day after the termination of the Royalty Agreement, USI sent a letter to its Delco-member clients informing them that USI's relationship with the Delco Chamber had been terminated. (Resp. Ex. F.) This correspondence informed USI's clients that it was "the Benefits-Administrator of another Association, [t]he [PLIB], and has made arrangements to automatically enroll your company in the PLIB at no cost to you." (Resp. Ex. F.) The correspondence advised that if the clients wished to maintain coverage through USI, all that was necessary was to decline to "sign a letter to place your insurance with an administrator other than USI."  (Resp. Ex. F.)  USI also placed phone calls to its customers as a follow-up to the

---

[5] USI did, however, continue to solicit businesses that were former USI clients and who had decided to change insurance brokers and use Brown & Brown.  (Mullin Dep., Resp. Ex. I.) According to Tyer, these businesses remained in the USI system because of their status as former clients.

January 2, 2012 correspondence. As part of that phone call, USI explained to businesses that their choice to continue using USI for insurance services did not in any way affect their membership with the Delco Chamber. (Sekkes Dep., at 72.)

After the Delco Chamber learned of USI's January 2, 2008 correspondence, it contacted USI and advised that it believed USI's conduct violated the Royalty Agreement. In response to the protest by the Delco Chamber, on March 12, 2008, USI human resources employee Trish Mullin sent an email informing the USI staff that they should "not contact any prospect . . . from the Delco chamber" because "[t]here are legal discussions taking place." (Resp. Ex. H.) The email further stated that all Delco Chamber accounts had been removed from Sales Logix, but that accounts added by salespeople without the appropriate association designation might remain in the system. (Resp. Ex. H.)

## II.    Legal Standard

USI has moved for summary judgment, arguing that the undisputed facts show that it complied with its obligations under the Royalty Agreement, that it returned all copies of the Membership List, and that it in no way interfered with the contractual relationship between the Delco Chamber and its members.

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met

8

simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325. After the moving party has met its initial burden, summary judgment is appropriate if the non-moving party fails to produce sufficient evidence to allow a reasonable jury to return a verdict in its favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

## III.   Discussion

Delco claims that USI breached the Royalty Agreement in four ways: (1) USI shared information about Delco members with the PLIB, violating its obligation to keep the Membership List confidential; (2) In approaching the PLIB to seek an agreement enrolling USI's Delco-member clients, USI violated its obligation to "promote DELCO membership to non-DELCO members" "where appropriate"; (3) USI failed to delete all electronic copies of the Membership List, and failed to return all physical copies; and (4) USI's automatic enrollment of its Delco-member clients in the PLIB violated an implied obligation of good faith and fair dealing. Delco also contends that USI was unjustly enriched by its use of the Membership List, and that the same conduct described by the breach of contract claims entitles it to recover on the tort theories of conversion and intentional interference with contractual relations.

### A.      Breach of Contract Law

To make out a cause of action for breach of contract, Delco must show: (1) the existence of a contract, (2) the breach of a duty imposed by the contract, and (3) damages resulting from the breach. Spang & Co. v. U.S. Steel Corp., 545 A.2d 861, 866 (Pa. 1988); Reformed Church of Ascension v. Theodore Hooven & Sons, Inc., 764 A.2d 1106, 1109 (Pa. Super. Ct. 2000).

"Contract interpretation is a question of law that requires the court to ascertain and give effect to the intent of the contracting parties as embodied in the written agreement." In re Old

9

Summit Mfg., LLC, 523 F.3d 134, 137 (3d Cir. 2008) (quoting Dep't of Transp. v. Pa. Indus. for the Blind & Handicapped, 886 A.2d 706, 711 (Pa. Cmwlth. 2005)).  "Pennsylvania courts apply the 'plain meaning rule' of interpretation of contracts which assumes that the intent of the parties to an instrument is embodied in the writing itself, and when the words are clear and unambiguous the intent is to be discovered only from the express language of the agreement." Hullett v. Towers, Perrin, Forster & Crosby, Inc., 38 F.3d 107, 111 (3d Cir. 1994) (quotation omitted).  A contractual clause is unambiguous where it is susceptible to only one reasonable interpretation.  See id. (citing Mellon Bank, N.A. v. Aetna Business Credit, Inc., 619 F.2d 1001, 1011 (3d Cir. 1980)) Courts "cannot make for the parties better agreements than they themselves have been satisfied to make." Green Cnty. v. Quinlan, 211 U.S. 582, 596 (1909).

**B.     General Findings – The Royalty Agreement**

The Royalty Agreement demonstrates the parties' intent to allow USI access to Delco's membership list during the contract term for the purpose of "solicit[ing] and plac[ing] insurance coverage." (Royalty Agreement ¶ 6.) Having the full membership list available, in easily accessible formats, allowed USI to carry out its contractual obligation to "use its best efforts to advertise and market the Sponsored Plans in order to increase the participation of DELCO members." (Royalty Agreement ¶ 7c.) This benefitted both parties. As Delco's President put it: "[I]f handing over two or three or four membership directories so they could disseminate them to their salespeople, they, being USI, could go out and drum up business. It was a good business decision for us to do that." (Vermeulen Dep., at 155.)

Once USI had effectively convinced a given Delco member to sign up as a client, that relationship would naturally produce information necessary to provide insurance brokerage and administrative services.  As USI's President explained, this information included "data relative to

10

the insurance policy that was placed," contact information for communication with the client, information necessary for billing administration, and information about the employees covered by a particular policy. (Tyer Dep., at 11.)  As noted previously, under the Royalty Agreement, "insurance records" regarding Delco members acquired during the contract term were considered the property of USI.  (Royalty Agreement ¶ 9.)  Although Tyer's testimony should not to be accepted as dispositive of the meaning of "insurance records," it is apparent that the contract contemplated that certain information produced by USI would fall into this category, and belong exclusively to USI. (Royalty Agreement ¶ 9.) As its exclusive property, USI was permitted by the contract to use the information for its own purposes, including providing continued service to its clients after the termination of the agreement.  Although the exact scope of each category may not be entirely clear, the Agreement is unambiguous in making this important distinction between the Membership List and the Insurance Records.

With the above overview of the contract in mind, we review each of Delco's claims below.

### 1.        Breach of the Confidentiality Provision

Delco first contends that USI breached its obligation to keep the Membership List confidential by sharing information about USI's Delco-member clients with the PLIB.  We disagree and for the following reasons find that Delco's claims of breach of confidentiality fail as a matter of law.

First, even if Delco had shared the identities and contact information of Delco members with the PLIB, this information was not confidential in a sense that it would give rise to a cognizable cause of action, and it was not in the power of the parties to make it actionable through the contract. In Pennsylvania, "the presence of a non-disclosure covenant . . . does not

create the right to protection but rather serves as evidence of the confidential nature of the data."
Morgan's Home Equip. Corp. v. Martucci, 136 A.2d 838, 843 n.5 (Pa. 1957); see also Iron Age
Corp. v. Dvorak, 880 A.2d 657, 664-65 (Pa. Super. Ct. 2005) (rejecting argument that non-
disclosure provision rendered confidential a customer list that trial court held was not a trade
secret). Delco thus cannot rely on the non-disclosure provision unless it can show, at the very
least, that the Membership List is confidential, and that it has taken steps to keep it that way.
Macbeth-Evans Glass Co. v. Schnelbach, 86 A. 688, 691 (Pa. 1913). More specifically, "mere
names and addresses easily ascertainable by observation or reference to directories" or other
sources are not protected by the law. Carl A. Colteryahn Dairy, Inc. v. Schneider Dairy, 203
A.2d 469, 473 (Pa. 1964). When phrased in terms of a tort, use of such information is
permissible because it is not a trade secret; when phrased in terms of a breach of contract, a
provision purporting to protect easily available information is an unreasonable and unenforceable
restrictive covenant. See Nat'l Risk Mgmt., Inc. v. Bramwell, 819 F. Supp. 417, 431 (E.D. Pa.
1993) ("Customer lists and confidential business information, however, cannot be trade secrets if
they are easily or readily obtained, without great difficulty, through some independent source
other than the trade secret holder."); Robert Half of PA Inc. v. Feight, 2000 WL 33223697, at
*10-11 (Pa. Comm. Pl. Ct. June 29, 2000) (holding that non-disclosure agreement could not
cover the "identities of . . . clients and candidates" that were "widely known throughout the . . .
trade").

Precedent supports this view. In Morgan's Home, the Court enforced an agreement
between an employer and an employee in which the employee promised to "keep confidential the
names and addresses of Morgan's customers." Morgan's Home, 136 A.2d at 841. The
confidentiality provision was enforced not merely because it was part of the agreement, but

12

because there was "no dispute that the customer data of the plaintiff company was both confidential and highly valuable." Id. at 843. In Dvorak, the Superior Court affirmed the trial court's refusal to enforce a similar agreement designed to prevent the "passing of sensitive documents or information regarding customers, sales, financials, or other such information." Dvorak, 880 A.2d at 660. The court specifically rejected the argument that the parties' non-disclosure agreement was determinative of the issue of whether the company's customer data was protectable: "A non-disclosure covenant does not create a per se right to protection, but is merely indicative of the parties' agreement as to the information's confidential nature." Id. at 664.

Application of this precedent reflects that Delco cannot, as a matter of law, establish a breach of contract claim as there can be no reasonable dispute that the secrecy of Delco's membership list, as defined in the Royalty Agreement, did not rise to the level of protectable confidential information. In fact, the record before us indicates that the list was not secret at all. Substantially similar information was freely available on the internet, and in a membership directory that Delco distributed to hundreds of its members. Delco also sold additional copies of the membership directory for $100. (Vermeulen Dep., at 142.) In short, the information that Delco complains USI failed to keep confidential was widely available to virtually everyone, and Delco made no effort to keep it under wraps. Like toothpaste that will not go back in the tube, Delco was not permitted, having released its membership list to the world, to transform it back into confidential information through its contract with USI.

### 2.    Claims Based On The Duty To Promote

Delco's next argument is that USI's enrollment of its clients in the PLIB constitutes a breach of the duty to "promote DELCO membership to non-DELCO members" "where

appropriate."  USI was only obligated to promote membership in the Delco Chamber during the term of the Royalty Agreement, which expired on January 1, 2008. The first notice any businesses received that mentioned the PLIB, or informed them of their opportunity to enroll in that organization was USI's January 2, 2008 correspondence, sent after termination of the royalty agreement. Although USI contacted the PLIB earlier, around the fall of 2007, (Tyer Dep., at 67), it is unclear how this contact could constitute a violation of the specific duty to promote Delco membership to non-Delco members. PLIB was a competitor of Delco, not a potential member, and Delco has offered no evidence that USI's Delco-member clients were actually enrolled and receiving association coverage through the PLIB prior to the termination of the contract. In fact, the evidence of record suggests that USI Delco member clients were receiving benefits through Delco through the termination of the agreement.  (Ex. F to USI Mot., Letter to USI's Delco-member clients ("Effective 1/1/2008, we will no longer be working with the chamber as their administrator."))

Perhaps realizing that it cannot rely on the express language of the agreement, Delco argues for a much broader reading of the promotion duty (which only requires promotion of Delco membership to *non*-members during the term of the agreement) than the language supports. Delco contends that USI breached the contract because "[t]he Royalty Agreement's provisions, read together and in context was designed, first and foremost, to protect the Delco Chamber's relationship with their Members." But even if this were so, it does not follow that USI had a specific contractually-enforceable duty to refrain from enrolling its Delco clients in a competing business organization. The Royalty Agreement contained eight subparagraphs listing the "Responsibilities of [USI]," not one of which forbade it from using its own insurance records to compete with Delco for its clients following termination of the Agreement, whether by

14

enrollment in a competing association or otherwise. USI had a strong business incentive to seek to enroll Delco members in its insurance program during the term of the Agreement, and a similarly strong incentive not to agree to provisions that would weaken its ability to compete for the clients it gained once the Agreement terminated. Although it may have been possible for Delco to write an enforceable non-compete provision covering USI's conduct, it did not do so, and we will not imply one. See Hutchison v. Sunbeam Coal Corp., 519 A.2d 385, 388 (Pa. 1986) ("The law will not imply a different contract than that which the parties have expressly adopted.")

### 3.    Claims Based On The Duty To Return Or Destroy Membership List

The next breach of the Royalty Agreement alleged by Delco relates to USI's obligation to delete all electronic copies of the Delco Chamber membership list from its computer system upon termination of the Royalty Agreement. USI's witnesses testified that it did so, and Delco does not directly dispute the point. (See Tyer Dep., at 36 ("I requested from our IT department the purging of information in Sales Logix and that would include list and follow-up information, if there was any prior contact.")) Instead, Delco argues that USI failed to also delete the "association codes" that identified USI clients who were also Delco members.

The presence of the association codes in USI's billing system allowed USI to identify those clients who needed to be offered enrollment in the PLIB following termination of the Royalty Agreement.[6] In Delco's view, this allowed USI to "essentially recreat[e] the Membership List," (Resp. 14), thus making the failure to delete the association codes a failure to

---

[6] Tyer testified that the association codes were "[n]umerical codes that we assign on every piece of business that is sold and placed in our data base, into our administration system." (Tyer Dep., at 13.) These codes were used to create the mailing list of Delco member-clients to whom the January 2, 2008 letter was directed. (Tyer Dep., at 98.)

delete the membership list. But this is an incorrect reading of the contract. We need not formulate an exhaustive definition of "insurance records" to determine that the association codes qualify as USI's property. At the very least, the plain meaning of "insurance records" would include information necessary to provide continued brokerage services to USI's Delco clients, such as contact information (important for billing and administrative reasons), information about insured employees, and any association codes used for billing purposes. In arguing that the association codes were simply the membership list by another name, Delco quotes several of Mr. Tyer's statements, all of which refer to the use of association codes for billing purposes. (Resp. 5-6.) Contrary to Delco's argument, this is precisely what makes the codes insurance records. Delco's claim that the failure to delete the association codes constituted a failure to delete the electronic membership list is therefore wrong as a matter of law.

Delco also alleges that USI breached its duty to return all paper copies of the Delco Chamber membership list. However, the only evidence they offer is the email circulated to USI employees by Trish Mullin in March, 2008. That email noted that legal discussions were taking place between Delco and USI, and requested that USI's sales employees "not contact any prospect you have from the Delco chamber." (Resp., Ex. H.)  The email specifically noted that "all accounts from Sales Logix coded as being a [Delco Chamber] member" had been removed, but cautioned sales employees to take special care because businesses that were entered without an association code would not have been purged from the system. (Resp., Ex. H.) This email plainly has no connection to the requirement to return physical copies of the membership list. Indeed, its reference to the removal of all Delco Chamber accounts from the Sales Logix system suggests the contrary, as does Jeffrey Vermeulen's testimony. (Vermeulen Dep., at 153-55 ("I do believe we actually did receive a directory or . . . more returned to the office"; "as a member in

16

good standing, they were entitled to have the directory"). We thus find Delco's reliance upon this email to be misplaced.

Apart from having no evidence to support its claim that USI failed to return the membership lists as required by the agreement, Delco's claim under this provision faces another fundamental problem. In order to prove its entitlement to relief, it is not enough for Delco to show that it was damaged; it must show that the damages resulted from the breach. Spang & Co., 545 A.2d at 866; see also Keystone Diesel Engine Co. v. Irwin, 191 A.2d 376, 378 (Pa. 1963) (observing that non-breaching party is entitled to collect those damages that "would naturally and ordinarily follow from the breach," "were reasonably foreseeable" at the time of the contract, and "can be proved with reasonable certainty"). Here, even if it is assumed that USI retained more copies of the membership list than it was entitled to, there is insufficient evidence of record to establish harm to Delco. Delco admits, after all, that following the termination of the Agreement, USI did not solicit Delco members who were not already USI clients, and therefore accessible through USI's own insurance records. (Def. SOF ¶ 14; Pl. SOF ¶ 14 (admitted)).  In any event, the membership list was readily available from other sources. Delco's damages, if there were any, did not flow from USI's retention of the membership list, but from its offer to current clients to enroll them in the PLIB.

### 4.    Claims Based On The Implied Duty Of Good Faith

Finally, Delco argues that independent of any express provision of the Agreement, USI's conduct in automatically enrolling its Delco-member clients in the PLIB breached the implied duty "to act in good faith and do nothing to destroy the rights of the other party to receive the fruits of the agreement." Somers v. Somers, 613 A.2d 1211, 1215 (Pa. Super. Ct. 1992). However, "[t]he duty of good faith applies 'only in limited circumstances' because 'implied

17

duties cannot trump the express provisions in the contract.'" Kamco Indus. Sales, Inc. v. Lovejoy, Inc., 779 F.Supp.2d 416, 426 (E.D. Pa. 2011) (quoting John v. Conomos, Inc. v. Sun Co., Inc., 831 A. 2d 696, 706 (Pa. Super. 2003)). The duty of good faith "is not divorced from the specific clauses of the contract and cannot be used to override an express contractual term." Northview Motors, Inc. v. Chrysler Motors Corp., 227 F.3d 78, 92 (3d Cir. 2000).

As previously noted, USI did nothing during the term of the Agreement to deprive Delco of benefits to which it was entitled (and Delco now admits that it has received all royalty payments to which the contract entitled it, (Def. SOF ¶ 21; Pl. SOF ¶ 21 (admitted)). USI's conduct in outcompeting Brown & Brown (and Delco itself) for its Delco-member clients after the term of the agreement cannot amount to bad faith, since it involved no element of dishonesty or subterfuge, did not violate any express provision of the Agreement, and did not frustrate any of Delco's legitimate expectations.[7] Restatement (Second) of Contracts § 205 cmt. a (1981); see also Pottstown Daily News Pub. Co. v. Pottstown Broadcasting Co., 192 A.2d 657, 663 (Pa. 1963) ("Competition in business is jealously protected by the law and the law abhors that which tends to diminish or stifle competition."); John B. Conomos, Inc. v. Sun Co., Inc., 831 A.2d 696, 708 (Pa. Super. Ct. 2003) ("when there is no provision creating an obligation, a failure to act in a certain way amounts to no more than exercise of privileges reserved in the contract.").

Accordingly, Delco has failed to present evidence sufficient to allow a jury to find in its favor as to its claims for breach of contract, and USI's motion for summary judgment will be granted.

---

[7] Delco's expectation of an "equal playing field" based on its assumption that USI's Delco-member clients would have to take some affirmative step to retain USI as their administrator was not "legitimate" within the meaning of this rule. The Royalty Agreement did not imply, or even suggest such a restriction on competition following termination. Delco's mistake does not amount to a legitimate expectation.

18

### B.        Unjust Enrichment

Delco acknowledges that its relationship with USI was governed by the Royalty Agreement, and that the existence of a contractual relationship would normally be fatal to a quasi-contractual unjust enrichment claim. However, Delco contends that "to the extent that the Plaintiffs are not covered and protected by the Royalty Agreement, an unjust enrichment claim would arise." (Resp., p. 25.) We disagree.

In Pennsylvania, "the doctrine of unjust enrichment is inapplicable when the relationship between the parties is founded upon a written agreement or express contract." Wilson Area Sch. Dist. v. Skepton, 895 A.2d 1250, 1254 (Pa. 2006). The idea behind this requirement is that where the parties have specifically agreed upon how to define and distribute their respective rights, duties, and expectations, they may not seek through the doctrine of unjust enrichment a better deal than they agreed to, "regardless of how 'harsh the provisions of such contracts may seem in light of subsequent happenings.'" Id. (quoting Third Nat'l & Trust Co. of Scranton v. Lehigh Valley Coal Co., 44 A.2d 571, 574 (1945)). A claim for unjust enrichment is barred by the existence of a valid contract even when a party "does not have a contractual remedy that can redress [the] allegedly wrongful conduct." Curley v. Allstate Ins. Co., 289 F. Supp. 2d 614, 619-20 (E.D. Pa. 2003) (applying Pennsylvania law).

It is undisputed that USI's use of the Delco Chamber Membership List is governed by the written Royalty Agreement. Because of that, Delco may not rely on an unjust enrichment theory. USI is entitled to summary judgment on this claim as well.[8]

---

[8] We note that the Complaint suggests that Delco's unjust enrichment claim only encompasses unpaid royalties due under the Agreement. USI paid the fees following the institution of litigation, and thus those fees are no longer at issue. (Def. SOF ¶ 21; Pl. SOF ¶ 21 (admitted))

### C.  Tort Claims

Finally, Delco has asserted two Pennsylvania tort claims—one for conversion, and one for intentional interference with contractual relations. These claims are both barred by Pennsylvania's two-year statute of limitations, and fail because Delco has not provided sufficient evidence to support them.

### 1.  Statute of Limitations

The statute of limitations for both conversion and interference with contractual relations is two years. 42 Pa.C.S. § 5524. Here, Delco's claims arise from conduct that occurred, at the latest, in the beginning of 2008. They claim that USI converted their Membership List by using it without authorization after termination of the Royalty Agreement, and that USI interfered with the relationship between the Delco Chamber and its members by enrolling certain members in the PLIB and notifying those businesses by sending the January 2, 2008 letter. Delco did not file a Writ of Summons, however, until December 29, 2011, nearly four years later and well outside of the two-year statute of limitations. (Mot., Ex. L.)

Delco attempts to avoid this defect by asserting that the continuing tort doctrine applies to its claims. That rule tolls the statute of limitations until the complete course of conduct constituting the tort is finished. See Dellape v. Murray, 651 A.2d 638, 640 (Pa. Cmwlth. Ct. 1994). The doctrine does not apply to a situation in which a discrete wrong causes ongoing harm. See id. ("We note that merely because the Dellapes' harm is continuous in nature does not make their cause of action against Murray a continuing tort."). Rather, "[a] continuing tort sufficient to toll the statute of limitations is occasioned by continual unlawful acts, not by continual ill effects from an original violation." CBG Occupational Therapy Inc. v. Bala Nursing & Retirement Ctr., 2005 WL 280838, at *3 (Pa. Comm. Pl. Jan. 27, 2005).

Pennsylvania courts have held that claims for conversion and intentional interference with contractual relations accrue when a plaintiff first becomes aware of the defendant's alleged wrongdoing. Id. (citing Eagan v. U.S. Expansion Bolt Co., 469 A.2d 680 (Pa. Super. Ct. 1983)). Delco learned of USI's letter, and their enrollment of Delco Chamber members in the PLIB, shortly after it was sent in early 2008. At that point, the tort was complete, and Delco's argument that it is suffering continued damage for as long as USI provides services to its Delco member clients does not make its claims "continuing" torts. These claims are barred by the statute of limitations. However, even if the statute of limitations did not preclude them, Delco has failed to provide sufficient evidence to survive summary judgment.

### 2.    Conversion

In order to establish a claim for conversion, a plaintiff must show that the defendant communicated a confidential trade secret to the defendant, which the defendant then misused to the plaintiff's detriment. See Am. Hearing Aid Assocs. v. GN ReSound N. Am., 309 F.Supp.2d 694, 705 (E.D. Pa. 2004). Although a member list may be a trade secret in appropriate circumstances, it is not entitled to protection if it is "easily or readily obtained, without great difficulty, through some independent source other than the trade secret holder." Nat'l Risk Mgmt., Inc. v. Bramwell, 819 F. Supp. 417, 431 (E.D. Pa. 1993). Here, as discussed above, the fact that certain businesses were members of the Delco Chamber was neither confidential nor a trade secret. The same information was freely available on the internet, and in the membership directory Delco provided to hundreds of its members, including USI. See Am. Hearing Aid, 309 F. Supp. 2d at 706 (concluding that American Hearing Aid's member list was not a trade secret because it was "readily available on the internet"); Spring Steels, Inc. v. Molloy, 162 A.2d 370, 372-73 (Pa. 1960) ("[E]quity is not protecting mere names and addresses easily ascertainable by

observation or by reference to directories." (quoting <u>Wiegand Co. v. Harold E. Trent Co.</u>, 122 F.2d 920, 924 (3d Cir. 1941))). Anyone could have used the publicly-available information to market products or services to members of the Delco chamber. Tort law does not bar USI from doing the same. USI is entitled to summary judgment on Delco's conversion claim.

### 3. Intentional Interference With Contractual Relations

To establish a claim for intentional interference with a contractual relation, a plaintiff must show, among other things, the "absence of privilege or justification" covering the defendant's conduct. <u>Crivelli v. Gen. Motors Corp.</u>, 215 F.3d 386, 394 (3d Cir. 2000). Pennsylvania recognizes, as does the Restatement, that business competition justifies inducing another to break an at-will contract if:

> (1) the relation concerns a matter involved in the competition between the actor and the other;
>
> (2) the actor does not employ wrongful means;
>
> (3) the action is not an unlawful restraint of trade; and
>
> (4) the actor's purpose is at least in part to advance his interest in competing with the other.

<u>Restatement (Second) of Torts</u> § 768(1); <u>Phillips v. Selig</u>, 959 A.2d 420, 431 (Pa. Super. Ct. 2008). The means of competition may be wrongful if, for example, a party used confidential information to coax Delco members away, <u>Adler, Barish, Daniels, Levin & Creskoff v. Epstein</u>, 393 A.2d 1175, 1185 (Pa. 1978), but we have already concluded that USI did no such thing. The conclusions reached above with respect to the breach of contract claims firmly establish that USI did nothing improper in enrolling Delco members in the PLIB for the purpose of continuing to act as their insurance broker. Delco can therefore not prove an essential element of its claim: that

USI's conduct was not covered by the competition privilege. Summary judgment will be granted to USI.

**II.      Conclusion**

We find that Delco has failed to identify any evidence that would support a reasonable fact-finder's conclusion that USI's conduct surrounding the termination of the Royalty Agreement breached any of its obligations under the contract. Additionally, we find that Delco's claims for unjust enrichment, conversion, and intentional interference with contractual relations are unsupported by the evidence. Accordingly, we find that there is no genuine issue of material fact and USI is entitled to judgment as a matter of law.

An appropriate Order follows.